IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

KASH REGISTER,

    Petitioner,               Case No. 2:05-cv-1084 ALA (HC)

    vs.

CLAUDE FINN,

    Respondent.[1]         <u>ORDER</u>

_____/

      Pending before the Court are Kash Register's ("Petitioner") application for a writ of habeas corpus pursuant to 28 U.S.C. § 2254(a) (doc. 1), Respondent's Answer (doc. 22), and Petitioner's Traverse (doc. 23). Also before the Court are the parties' briefs filed in response to this Court's December 18, 2007, order requesting additional briefing on the applicability of *Irons v. Carey*, 505 F.3d 846 (9th Cir. 2007), if any, to this matter. For the reasons discussed below, Petitioner's application is denied.

**I**

      On October 31, 1979, a Los Angeles County Superior Court jury found Petitioner guilty of first degree murder. On December 17, 1979, Petitioner was sentenced to life in prison without

---

[1] Claude Finn is substituted for his predecessor, Steve Moore, as the warden where the prisoner is incarcerated, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure.

1

the possibility of parole. On June 14, 1985, Petitioner was re-sentenced to 27 years to life. His earliest parole date was March 31, 1997.

On May 9, 2002 ("2002 Decision"), and May 22, 2003 ("2003 Decision"), the California Board of Prison Terms ("BPT") decided that Petitioner was unsuitable for release on parole. Petitioner challenged both parole denials in a state habeas corpus petition.

On November 14, 2003, the Los Angeles County Superior Court denied Petitioner's petition for a writ of habeas corpus. The court held that "any challenges to petitioner's 2002 suitability hearing are moot as petitioner received a subsequent suitability hearing in 2003." As to the 2003 BPT Decision, the Superior Court concluded that the BPT's decision was supported by some evidence, "including petitioner's weak parole plans, and petitioner's institutional behavior." The court also rejected Petitioner's contention that the BPT erred in concluding in its 2003 decision that he was unsuitable for release on parole. The Superior Court's order reads as follows:

> The Court has read and considered the Petition for Writ of Habeas Corpus filed on September 9, 2003:
> Petitioner challenges the 2002 and 2003 decisions of the Board of Prison Terms ("Board") which found petitioner unsuitable for parole. However, any challenges to petitioner's 2002 suitability hearing are moot as petitioner received a subsequent suitability hearing in 2003. Accordingly, this Order addresses petitioner's arguments regarding his parole suitability hearing held on May 22, 2003.
> According to the writ, petitioner was convicted of first-degree murder in 1979. The conviction was overturned, however, and on June 14, 1985, petitioner was re-sentenced to twenty-seven (27) years to life for first-degree murder, with use of a firearm, Petitioner denies committing the crime.
>
> Petitioner appeared for his fourth parole suitability hearing on May 22, 2003. The Board found him unsuitable for parole and set his next hearing in one year. Petitioner alleges that the Board's decision is not supported by evidence.
> The Court has independently reviewed the record with deference to the Board's "broad discretion" in parole matters (*In re Rosenkrantz* (2002) 29 Cal.4th at p. 659). Each of the Board's findings is supported by "some evidence," including petitioner's week parole plans, and petitioner's institutional behavior. (*In re*

2

> *Rosenkrantz*, *supra* 29 Cal.4th at p. 652). The record also reflects that the Board considered petitioner's post conviction gains, but found that petitioner needed to demonstrate an ability to maintain gains over an extended period of time. (Pen. Code § 3041, subd. (b)) All findings are supported by "some evidence." (*In re Rosenkrantz*, *supra* 29 Cal.4th at p. 652).
>
> In light of the above, the petition for writ of habeas corpus is denied.

Petitioner then filed a document he styled "Response" to the Superior Court's denial of his petition for a writ of habeas corpus in the California Court of Appeal. That Court summarily denied Petitioner's request for relief.[2] The California Supreme Court also summarily denied a petition for habeas corpus Petitioner filed before that Court.

In determining whether the California courts had erred in holding that Petitioner had failed to demonstrate that his federal constitutional rights have been violated, this Court must look to the Los Angeles County Superior Court's decision as the last reasoned state court opinion addressing Petitioner's arguments. *See Franklin v. Johnson*, 290 F.3d 1223, 1233 n.3 (9th Cir. 2002) (explaining that when a subsequent appeal is denied without comment, a federal court must look to the last state court decision that actually addresses a claim).

Petitioner filed an application for habeas corpus relief in this Court on June 1, 2005, pursuant to U.S.C. § 2254(a).

## II

### A

An application for a writ of habeas corpus on behalf of a person in custody pursuant to a state court judgment "shall not be granted with respect to any claim that was adjudicated on the merits" in state court unless the adjudication of the claim:

---

[2] "[T]he sole and proper remedy after denial of a petition for writ of habeas corpus by a superior court is to file a new petition with the Court of Appeal, which has original jurisdiction in habeas corpus matters." *In re Reed*, 33 Cal. 3d 914, 918 n.2 (1983), *overruled on other grounds in In re Alva*, 33 Cal. 4th 254, 264 (2004). "Further review may be sought in [the California Supreme Court] either by a new petition for habeas corpus or, preferably, by a petition for hearing." *Id.* Petitioner incorrectly labeled the document he filed with the Court of Appeal. This mistake does not affect this Court's jurisdiction to review Petitioner's application.

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

**B**

Petitioner alleged in his § 2254(a) application that "there is no evidence in the record to support" the BPT's 2002 Decision and its 2003 Decision finding Petitioner unsuitable for parole. He argues that the BPT's decisions were arbitrary, and therefore violated the California Constitution, and the Fourteenth Amendment of the United States Constitution.[3]

In his answer to Petitioner's application for a writ of habeas corpus, Respondent maintains that a prisoner does not have a federally protected liberty interest in parole under California Penal Code § 3041. This contention is contrary to the Ninth Circuit's decision in *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1127-28 (9th Cir. 2006).

This Court must reject Respondent's contention under compulsion of Ninth Circuit precedent that provides that "California's parole scheme gives rise to a cognizable liberty interest in release on parole." *Id.* at 1127 (citation omitted).

**C**

In *Superintendent v. Hill*, 472 U.S. 445, 454 (1985), the Supreme Court held that "revocation of good time does not comport with 'the minimum requirements of procedural due process,' unless the findings of the prison disciplinary board are supported by some evidence in

---

[3] "[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions. In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). Therefore, Petitioner's claim that his rights under California law were violated will not be addressed.

4

the record." (Citation omitted).  This Court is bound by the Ninth Circuit's holding that the "some evidence" standard announced in *Hill* applies to parole release proceedings.  *Sass*, 461 F.3d at 1128-29.

"To determine whether the some evidence standard is met 'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id.* at 1128 (quoting *Hill*, 472 U.S. at 455-56).  "*Hill*'s some evidence standard is minimal, and assures that 'the record is not so devoid of evidence that the findings of the disciplinary board were without support or otherwise arbitrary.'" *Id.* at 1129 (quoting *Hill*, 472 U.S. at 457).

In *Irons v. Carey*, 505 F.3d 847, 853 (9th Cir. 2007) the Court held that

> where, as here, there is some evidence to support a finding that "the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering" and the "motive for the crime is inexplicable or very trivial in relation to the offense," Cal. Code Regs., tit. 15 § 2402(c)(1)(D)-(E), we cannot say that the state court unreasonably applied *Hill*'s "some evidence" principle.

In *Irons*, the record showed that the BPT relied on the commitment offense in determining that the prisoner was not suitable for release on parole.  *Id.* at 852.

The Ninth Circuit limited its holding in *Irons* as follows: "All we held in [*Sass*, 461 F.3d at 1125 and *Biggs v. Terhune*, 334 F.3d 910, 912 (9th Cir. 2002)] and all we hold today, therefore, is that, given the particular circumstances of the offenses of these cases, due process was not violated when these prisoners were deemed unsuitable for parole prior to the expiration of their minimum terms."  *Irons*, 505 F.3d at 853-54.  In an unusual comment in *Irons*, the panel expressed its aspiration that some future court decision will conclude that the BPT has the duty to grant parole where "there was substantial evidence in the record demonstrating rehabilitation." *Id.* at 854.

///

5

The Court stated:

> We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes.

*Id.*

The *Irons* panel did not cite any authority to support its prognostication that the denial by the state court of habeas corpus relief, under such circumstances, would be "contrary to, or involve[] an unreasonable application of clearly established Federal law, as determined by the Supreme Court of the United States" in violation of 28 U.S.C. § 2254(d)(1). No presently binding Ninth Circuit decision has fulfilled the prediction of the *Irons*'s panel.

In the precedential portion of the *Irons* decision, the Court held that "we must look to California law to determine the findings that are necessary to deem a prisoner unsuitable for parole, and then must review the record in order to determine whether the state court decision holding that these findings were supported by 'some evidence.'" *Irons*, 505 F.3d at 851. Under California law, a prisoner is unsuitable for parole if:

> (1) the prisoner committed the offense in an especially heinous, atrocious, or cruel manner;
> (2) the prisoner has a previous record of violence;
> (3) the prisoner has an unstable social history;
> (4) the prisoner has committed sadistic sex offenses;
> (5) the prisoner has a history of mental or psychological problems; and
> (6) the prisoner has engaged in serious misconduct while in prison.

Cal. Code Regs., tit. 15 § 2402(c).

**III**

**A**

In response to this Court's request for supplemental briefing, following the publication of the *Irons* decision, Petitioner stated: "*Irons* has limited, if any applicability to the instant case of petitioner." Petitioner noted that, unlike the petition in *Irons*, he has served his minimum term. His minimum parole date was March 31, 1997.

6

Petitioner also argued that under *Irons*, "a commitment offense must exceed the minimum elements of the crime to warrant parole denial." He maintains that "the killing was not accomplished with any undue torture or other facts aggravating the behavior."

In his supplemental brief, Respondent again asserts that the "some evidence" standard set forth in *Irons* is not a proper basis for granting relief under AEDPA because it relies solely on circuit precedent, and is therefore not "clearly established Federal law, as determined by the Supreme Court of the United States."

As noted above, according to the Ninth Circuit's decision in *Sass*, the "some evidence" rule set forth in *Hill* governs parole denial claims. *Sass*, 461 F.3d at 1128-29. This Court must apply the law of this Circuit. *See Zuniga v. United Can Co.*, 812 F.2d 443, 450 (9th Cir. 1987) (citation omitted) ("District courts are, of course, bound by the law of their own circuit and 'are not to resolve splits between circuits no matter how egregiously in error they may feel their own circuit to be.'"). [Accordingly, this Court must determine whether "some evidence" supported BPT's decisions in 2002 and 2003 that Petitioner is not yet suitable for parole and because he would "pose an unreasonable risk of danger to society if released from prison." Code Regs., tit. 15 § 2402(c).

**B**

The BPT's 2002 decision reads as follows:

> We're back on the record. The parties have returned to the room. It's 9:12 a.m. And Mr. Register, we did deny your parole for a year. Let me read the decision to you. The Panel reviewed all information received at the hearing and relied on the following circumstances in concluding that the prisoner is not yet suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. One was the timing and gravity of the commitment offense itself. It was carried out in a very brutal and violent manner. These conclusions are drawn from the Statement of Facts wherein the prisoner, according to the facts of the case, the crime for which he was committed, approached an elderly victim, 78 years of age who was hard of hearing and was seated in his vehicle. Approached him with a gun, shot him, took his property. Apparently the body fell forward and hit the horn on the car so the horn was honking and Mr. Register came back and

7

shot him repeatedly again, and then fled the scene. He was identified by witnesses who saw what occurred, and by the victim himself who survived long enough to make an identification, as did the two witnesses. Regarding his previous record, it was limited to being a juvenile because he was just 18 at the time of the commitment offense. He had sustained petitions for offenses such as petty theft, grand theft person and grand theft merchandise. He had finished high school. No indication in the record that he was involved in gangs or narcotics or anything of that nature. His institutional behavior certainly has improved of recent years, although he did have some problems early on. He should be commended for the fact that he hasn't had a 115 since 1995 and his last 128 was in 1997. So he has been disciplinary-free for a little over seven years regarding 115s. He has upgraded himself vocationally, completing the Masonry trade during this period. And he's participated in some self-help, consistently participating in AA in a program he was in called P.H.A.S.E.S. The psychological evaluation by Dr. Beermann and updated by Dr. Macomber is supportive. It says, in Dr. Beermann's evaluation, that:

> "in my opinion, Mr. Register does not pose more than a normal risk factor whether in or out of a controlled environment. No risk factors are apparent. This inmate was very articulate and cooperative and, in my opinion, would be a reasonable candidate for parole."

One area that they don't comment on that I do have a concern with, and this is always a difficulty when an inmate asserts his innocence, is the area of remorse, which the Board is required to try and assess, which is difficult to do. And I think one of the previous psychologists said it very well in his report, and that was Dr. Morgan back in 1992, where he said that his lack of recognition of the offense for which he was convicted would tend to preclude any feelings of remorse and makes it impossible to address the magnitude of his offense, which does put the Board in a bit of a dilemma. On the other hand, his parole plans appear to be in order. He does have some family support. In response to 3042 notices, we had a representative from the District Attorney's Office who was present and voiced opposition to parole. So our recommendations are going to be just that he remain disciplinary-free and continue his present program, participating in self-help and therapy when it's available to him.

**C**

In denying parole release to Petitioner in 2003, the BPT reasoned as follows:

> The Panel has reviewed all of the information received from the public and relied on the following circumstances in concluding the prisoner is not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison. The offense was carried out in an especially cruel manner. The offense was carried out in a very calculated manner and ended

8

up being an execution-style murder. The offense was carried out in in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was very inexplicable or unexplainable, since we don't really know what the motive for the crime was, in relation to the offense. These conclusions are drawn from the Statement of Facts wherein the prisoner approached the 78-year-old victim who was sitting in his car, and his wallet and money were taken. Three shots were fired. When the victim fell on the horn of the car, the prisoner returned and shot him two more times, which resulted in his subsequent death. The prisoner has an escalating pattern of criminal conduct, and he has failed to – previous grants of probation, and he failed to profit from society's attempts to correct his criminality. And those attempts were arrest as a juvenile and juvenile probation. He has an unstable social history and prior criminality. He did use marijuana while he was on the street, and had arrests for possession of a switchblade, shoplifting, grand theft person, and grand theft merchandise. The parole plans are kind of what we see right now as a thing that you really need to firm up, Mr. Register. We know – We have the letter from your mother saying that you have a place to live, and I know that you've made some contacts with what you could do as far as employment. We really need letters. We really need something solid to show that you at least have written the letters and that you have gotten responses back and what those responses are. And then you had made a statement that you would do whatever it was the Board had requested of you to do. But I think that it will be very important for you to be involved in self-help or AA when you are released, or Narcotics Anonymous because of your use of marijuana on the streets, and then also the fact that in '81 you were in possession of marijuana while you were in prison. So it'll just be very important that you make sure that you follow-up with that. So you'll need to identify those programs and know where they are in relationship to where your mother's house is. The prisoner -- The Hearing Panel notes that 3042 notices indicate an opposition of a finding of parole suitability. Specifically, form the District Attorney of Los Angeles County who was here today. And other information bearing upon suitability was taken into consideration, the counselor's report. And this was done by Counselor Flatt, F-L-A-T-T. And I think Counselor Flatt made a very good analysis when he talked about all of your participation in self-help programs being commendable. And it demonstrated your correct approach to a positive future. However, what he found disturbing is the extensive history of disciplinary violations, and he said,

> "In addition to an extensive list of counseling chronos, he has 12 RBRs ranging from minor offenses to very serious, with the last one being in 1997. So that he needs to concentrate on continuing to be disciplinary-free, and I feel that a continuance of this disciplinary-free behavior is the one remaining obstacle that he needs to overcome."

9

> I think the Panel sees that, too. For someone that came in and has pled their innocence for all of these years, and yet there is behavior that was indicative of some of the things that were happening on the street. So it's going to be very, very important that you continue to remain disciplinary-free. So we just said that your gains are recent, from '97 to the current, and you must demonstrate an ability to maintain your gains over an extended period of time. However, it's not very many inmates that we talk to that have four vocations like you have, your vocation in landscaping, auto mechanics, machine shop, and masonry. I have no doubt you'll be able to go to work. That's – A big thing that you have to work on is trying to get a letter from prospective employers, that you would be acceptable to them. You have your high school diploma, and you have all kinds of self-help, your Ways to Happiness, your Life Skills, Friends Outside, Creative Conflict Resolution Program, your faith based prerelease program, your AA/NA, and your taking turns at being sergeant at arms in there, Basic Alternatives to Violence, Breaking Barriers, and a lot of laudatory chronos for what you're doing. So you have a whole lot of real positive things going for you. If it were not for the amount of disciplinaries that you've had, you would actually be looking -- your record looks really good. So we're asking that you remain disciplinary-free. I can't tell you how important that is going to be. Any new disciplines is going to really set you back. And if available, just continue to participate in self-help. We can't require further education or vocation because you've really done a lot. So just continue to do the things that you're doing.

**D**

Under *Irons*, this Court must look to California law to determine whether the BPT's decision that Petitioner was not eligible for release was supported by some evidence of one of the factors set forth in § 2402(c). The California Court of Appeal First Appellate Division in *In re Caswell*, 92 Cal. App. 4th 1017 (2001) held that the BPT's decision that the release date granted to a prisoner should be rescinded because there was some evidence in the record that he had committed an atrocious crime. The facts in *Caswell* closely parallel the evidence acted upon by the BPT in the instant matter.

The Court of Appeal held in *Caswell* that "a prisoner's refusal to admit participation in the crime on matters of conflicting evidence does not necessarily constitute unsuitability for parole or mandate recession." *Id.* at 1033. The Court in *Caswell* relied on Section 2236 of Title 15 of the California Code of Regulations for this proposition. Section 2236 reads as follows:

///

> The facts of the crime shall be discussed with the prisoner to *assist in* determining the extent of personal culpability. The board shall not require an admission of guilt to any crime for which the prisoner was committed. A prisoner may refuse to discuss the facts of the *crime in which instance a decision shall be made based on the other information available* and the refusal shall not be held against the prisoner. (emphasis added).

The Court noted in *Caswell* that the prisoner "acknowledged responsibility and demonstrated remorse." *Id.* The prisoner in *Caswell* testified that "the crimes escalated because of his 'inability to control' and his 'omission to do anything to counter what [Englund] want[ed] [him] to do.'"

In *Caswell*, the prisoner was granted a parole and given a release date effective in September 2000 by a panel of the BPT. The panel found Caswell suitable for parole based on:

> his minimal criminal record and lack of significant history of violent crimes; his stable social history, his participation in education programs, self-help programs, and vocational programs while in prison; his maturity and age; his parole plans, including job offers and family support; his positive institutional behavior; and favorable psychological evaluations.

*Id.* at 1024. The BPT, sitting en banc, reviewed the grant of the parole release date. "[T]he Board ordered that a parole rescission hearing be conducted to determine whether there was good cause to rescind Caswell's parole." *Id.* The Board identified three reasons for ordering the parole rescission hearing: "(1) the extreme seriousness of the crime; (2) Caswell's minimization of his involvement in the commitment offenses; and (3) Caswell's lack of remorse."

A panel of the BPT held a rescission hearing in March 1999. The panel rescinded Caswell's parole. It based its decision on "the extreme seriousness of the crimes and Caswell's minimization of his involvement." *Id.* at 1025. The rescission panel determined, however, that Caswell had shown "sufficient remorse." *Id.*

///

///

///

11

1    The Board's appeals unit denied Caswell's petition for relief.  The Solano County
2 Superior Court granted Caswell's petition for habeas corpus relief and ordered the Board to
3 reinstate Caswell's parole release date.  *Id.*  The Board appealed to the California Court of
4 Appeal.

5    The California Court of Appeal held that "parole may be rescinded if the granting panel
6 failed to adequately consider the gravity of the [offense]." *Id.* at 1027 (citing *In re Johnson*, 35
7 Cal. App. 4th 160, 168-69 (1995)).  The Court reversed the judgment of the Solano County
8 Superior Court on the sole ground that there was some evidence in the record that the 1986 panel
9 that ordered his release "failed to adequately consider the gravity of Caswell's criminal acts." *Id.*
10 at 1034.

11    Thus, under the California Court of Appeal's interpretation of that state's law respecting
12 parole release decision in *Caswell*, a release may be denied if there is some evidence to support
13 the BPT's determination that the gravity of the offense poses an unreasonable threat to public
14 safety, notwithstanding undisputed evidence of a prisoner's positive institutional behavior and
15 participation in educational and self-help programs.

16    In the matter *sub judice*, the evidence that Petitioner is not suitable for parole is much
17 stronger than the facts considered by the 1999 panel in rescinding the parole release in *Caswell*.
18 Unlike the prisoner in *Caswell*, Petitioner in this matter has never acknowledged his
19 responsibility for his crime.  As a result, the BPT had to rely on the fact that a jury unanimously
20 found him guilty, based in part on the testimony of an eye witness who had gone to high school
21 with him.  The record shows that Petitioner was committed to prison for committing an especially
22 atrocious homicide.  He returned to assassinate his helpless seventy-eight-year-old victim after he
23 had shot him three times and robbed him.

24    In its 2002 decision, the BPT expressly relied on the brutal and violent manner in which
25 Petitioner committed the crime that caused his commitment.  However, the BPT did not rely
26 solely on that factor in finding that Petitioner posed an unreasonable risk of danger to society and

a threat to public safety if he were released. It also expressed its concern that his failure to accept responsibility for his crime "makes it impossible to address the magnitude of his offense."

In its 2003 decision, the BPT again found that Petitioner was unsuitable for parole because "[t]he offense was carried out in a very calculated manner and ended up being an execution-style murder." The BPT also found that "[t]he offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering, and the motive for the crime was very inexplicable or unexplainable, so that we don't know what the motive for the crime was in relation to offense." Petitioner's failure to accept responsibility for his crime understandably casts doubt as to whether he no longer poses a threat to society.

The BPT also noted that prior to killing his victim, "[t]he prisoner ha[d] an escalating pattern of criminal conduct and he has failed previous grants of probation and he failed to profit from society's previous attempts to correct his behavior." The BPT also expressed its concern that a prison counselor had reported that, while imprisoned, Petitioner "[i]n addition to an extensive list of counseling chronos, he has 12 RBRs ranging from minor offenses to very serious, with the last one being in 1997." The BPT appropriately expressed its concern that "[f]or someone that came in and has pled their [sic] innocence for all these years, and yet there is behavior that was indicative of some of the things that were happening on the street." Pursuant to *Sass*, this Court lacks the power to reweigh the evidence considered by the BPT. The BPT's findings were supported by some evidence and were not arbitrary. *Sass*, 461 F.3d at 1129.

## CONCLUSION

There is some evidence in the record that Petitioner was not suitable for release because of the atrocious nature of the crime he committed, his history of committing crimes after being released on probation, his failure to accept responsibility for his crime, and his violation of prison regulations behind prison walls while under constant observation by guards. Petitioner failed to demonstrate that the Solano County Superior Court's decision was without support or arbitrary, as well as contrary to clearly established federal law as determined by the United States Supreme

1  Court.

2      Therefore, it is hereby ORDERED that Petitioner's application for habeas corpus relief is

3  DENIED.

5  DATED: May 23, 2008

                                    <u>/s/ Arthur Alarcón</u>
                                    UNITED STATES CIRCUIT JUDGE
                                    Sitting by Designation